IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBBIE L. MORGAN,                          Case No. 6:12-cv-01235-AA
                                              OPINION AND ORDER
            Plaintiff,

      v.

CAROLYN W. COLVIN,
Commissioner of Social
Security,

            Defendant.
_____

Tim D. Wilborn
Wilborn Law Office, P.C.
P.O. Box 370578
Las Vegas, Nevada 89137
      Attorney for plaintiff

S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201

Jeffrey R. McClain
Jeffrey E. Staples
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104
      Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiff Robbie Morgan brings this action pursuant to the Social Security Act ("Act") to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied plaintiff's application for Title II disability insurance benefits ("DIB") under the Act. For the reasons set forth below, the Commissioner's decision is reversed and this case is remanded for the immediate payment of benefits.

## PROCEDURAL BACKGROUND

On February 21, 2006, plaintiff filed her second application for DIB.[1]  Tr. 104-08, 459-60.  After her application was denied initially and upon reconsideration, plaintiff timely requested a hearing before an administrative law judge ("ALJ").  Tr. 79-87.  On March 19, 2008, an ALJ hearing was held, wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE").  Tr. 29-69, 503-50, 608-48.  On June 11, 2008, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act.  Tr. 8-15, 554-61.  Plaintiff appealed the ALJ's 2008 decision after the Appeals Council declined review.  Tr. 1-4, 562-

---

[1] The record does not include any documentation of plaintiff's previous DIB claim, except for the ALJ's August 16, 2003 decision denying her application for benefits.  Tr. 21-28, 459-60.  The Appeals Council denied review of the ALJ's 2003 decision and plaintiff did not file any further appeals thereafter.  Tr. 459-60.  Thus, although plaintiff's current DIB application alleges disability as of December 15, 1999, and there is medical evidence in the record dating as far back as 2001, "the earliest date Plaintiff could be eligible for disability benefits [is August 17, 2003,]" the date after the prior final decision of the Commissioner.  Pl.'s Opening Br. 2 n.1; see also Tr. 459-60, 614.

Page 2 - OPINION AND ORDER

65.

On July 16, 2009, the parties stipulated to several reversible errors; the Honorable Anna Brown therefore reversed the ALJ's 2008 decision and remanded the matter for further proceedings. Tr. 566-70; see also Tr. 573-75. Accordingly, an additional hearing was conducted on June 24, 2010, wherein plaintiff was once again represented by counsel and testified. Tr. 479-502. On August 13, 2010, the ALJ issued another decision finding plaintiff not disabled. Tr. 459-72. After the Appeals Council denied review, plaintiff filed a complaint in this Court. Tr. 412-55.

### STATEMENT OF FACTS

Born on June 8, 1962, plaintiff was 37 years old on the alleged onset date of disability and 48 years old at the time of the 2010 hearing. Tr. 104, 487. Plaintiff graduated from high school and worked previously as a bookkeeper, controller, and sales clerk. Tr. 67, 124, 470, 512, 646. She alleges disability as of December 15, 1999 due to Lyme disease,[2] heavy metal poisoning, degenerative disc disease, and left shoulder strain, which are

---

[2] In 2003, plaintiff sustained a tick bite that would not heal. See, e.g., Tr. 205, 223, 256-57, 376. While plaintiff allegedly may have also experienced other tick bites in 1996 or 1997, there is no argument or evidence indicating that these bites resulted signs or symptoms consistent with Lyme disease, or a positive blood test. Tr. 215, 671; see generally Pl.'s Opening Br.; Pl.'s Reply Br. Further, the medical records most contemporary to that period reflect that Lyme disease was not suspected, even as a rule our possibility. See Tr. 431, 705. In any event, plaintiff's Lyme disease diagnosis, obtained prior to the date last insured and based on her constellation of symptoms, was ultimately confirmed by blood tests performed in 2008. Tr. 249-58, 675-92, 704. Accordingly, the record demonstrates that plaintiff's Lyme disease originated with the 2003 tick bite.

accompanied by pain, fatigue, seizures, light sensitivity, and poor concentration, memory, and balance.  Tr. 104, 120, 179, 195.

## STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is rational.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

The initial burden of proof rests upon the claimant to establish disability.  Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).  To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1502.  First,

the Commissioner determines whether a claimant is engaged in "substantial gainful activity." Yuckert, 482 U.S. at 140; 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled.

At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, she is not disabled.

At step three, the Commissioner determines whether the claimant's impairments, either singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(d). If so, the claimant is presumptively disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can work, she is not disabled; if she cannot perform past relevant work, the burden shifts to the Commissioner. At step five, the Commissioner must establish that the claimant can perform other work that exists in significant numbers in the national and local economy. Yuckert, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(e) & (f). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 404.1566.

## THE ALJ's FINDINGS

At step one of the five step sequential evaluation process

outlined above, the ALJ found that plaintiff had not engaged in substantial gainful activity "during the period from her alleged onset date of December 15, 1999 through her date last insured of September 30, 2005." Tr. 462.   At step two, the ALJ determined that plaintiff had the following severe impairments: Lyme disease, mild degenerative disc disease of the cervical spine, and left shoulder strain.   Id.   At step three, the ALJ found that plaintiff's impairments did not meet or equal the requirements of a listed impairment.   Tr. 463.

Because she did not establish disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work.   The ALJ resolved that plaintiff had the residual functional capacity ("RFC") to perform the full range of medium exertion work, which generally entails "lifting and carrying 50 pounds occasionally, 25 pounds frequently, standing and walking about six hours of an eight hour workday and sitting about six hours of an eight hour workday."   Id.

At step four, the ALJ found that plaintiff could perform her past relevant work of controller or sales clerk.   Tr. 470.   Based on these findings, the ALJ concluded that plaintiff was not disabled under the Act.   Tr. 471.

## DISCUSSION

Plaintiff argues that the ALJ erred by: (1) discrediting her subjective symptom testimony; (2) rejecting the lay witness statements of her husband, Alan Hathaway; (3) improperly assessing the medical opinions of Jon Counts, M.D., Raphael Stricker, M.D.,

Page 6 - OPINION AND ORDER

and James Springer, M.D.; and (4) failing to include restrictions
for all of her impairments in the RFC and dispositive hypothetical
question posed to the VE.

I.   Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to provide a clear and
convincing reason, supported by substantial evidence, for rejecting
her subjective symptom testimony regarding the extent of her
impairments. When a claimant has medically documented impairments
that could reasonably be expected to produce some degree of the
symptoms complained of, and the record contains no affirmative
evidence of malingering, "the ALJ can reject the claimant's
testimony about the severity of . . . symptoms only by offering
specific, clear and convincing reasons for doing so." Smolen v.
Chater, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted).

A general assertion that plaintiff is not credible is
insufficient; the ALJ must "state which . . . testimony is not
credible and what evidence suggests the complaints are not
credible." Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).
The reasons proffered must be "sufficiently specific to permit the
reviewing court to conclude that the ALJ did not arbitrarily
discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d
748, 750 (9th Cir. 1995) (citation omitted). If, however, the
"ALJ's credibility finding is supported by substantial evidence in
the record, we may not engage in second-guessing." Thomas v.
Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

In March and April 2006, approximately six months after her

Page 7 - OPINION AND ORDER

date last insured, plaintiff completed an adult function report, as well as pain, fatigue, and seizure questionnaires. In these reports, plaintiff described her daily activities as follows:

> let[ting] the dog out, fix[ing] a cup of tea, feed[ing] the dog, rest[ing] in my chair with my heating pad, it takes me between 1 hour to about 2 ½ hours to start to feeling up to [the] next step of the day – depending on my neurological and pain levels . . . If the nausea is not to[o] bad I then fix myself something to eat, what I eat depends on what I am up to preparing and how I feel. Then I rest again. Then I try and do a few chores around the house [such as a laundry or cooking] . . . When I overd[o] it then I hurt so bad at night that I cannot sleep well. If I am not to[o] worn down or in to[o] much pain I try and fix a meal. I have to rest a lot between this process.

Tr. 149, 151; see also Tr. 138-40, 158-64. Plaintiff signaled no problem with personal care, although "some days I feel so bad . . . I just stay in and will not get dress[ed] or bath[e]." Tr. 150. She also reported that her husband "does all the yard work" and a housekeeper "does 80% of the cleaning." Tr. 152. Additionally, plaintiff remarked that she is able to shop, but her "husband also helps" and she "make[s] smaller more frequent trips, so I do not get wor[n] out." Tr. 153. As for social activities, plaintiff stated that she visits with friends and family "on days I feel better," and "once in a while my husband will take me out to eat." Tr. 154.

Plaintiff's subsequent testimony was similar to her 2006 statements; at the 2008 and 2010 hearings, plaintiff reported that she was unable to perform her previous job as a bookkeeper because she made "a lot of mistakes" due to "the neurological damage caused by the Lyme disease," such as mis-transcribing numbers and letters,

and mis-remembering relevant information.  Tr. 43-44; see also Tr. 496-97.  Plaintiff also described orthopedic problems associated with her Lyme disease, including knee, neck, and shoulder pain, which made it difficult to bend, lift, stand, or sit for prolonged periods.  Tr. 52-54; see also Tr. 491, 494-96.  Further, plaintiff testified that she began experiencing aural seizures, two to three times per day, sometime between "July of '03 and May of '05," which were accompanied by fatigue, dizziness, and nausea; they initially receded when she started Lyme disease treatment but when "they put the pick line in my arm and gave me the intravenous antibiotics I started having more of them then."  Tr. 47-51; see also Tr. 494-96.

When asked to describe a typical day, plaintiff responded that "I don't have a typical day . . . my life now is based on if I've overdone it maybe the day before or what my pain level is, what my neurological symptoms are that day . . . [my average] pain level [is] about somewhere between five and seven."  Tr. 56.  On a good day, plaintiff indicated that she could perform minor chores, such as a load of laundry, dishes, or cooking, and independently go the grocery store, but only for a few items at a time.  Tr. 54-59; see also Tr. 489-91.  She clarified, however, that she takes breaks frequently throughout this process.  Id.  Her husband, a neighbor, and a housekeeper perform the remainder of the household chores.  Tr. 57-58.

After summarizing plaintiff's 2006 and 2008 testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms,

but that her statements regarding the extent of these symptoms were not fully credible because she: (1) "was working as a bookkeeper for a florist throughout the period at issue . . . and failed to report earnings"; (2) engaged in activities of daily living that demonstrated the functional ability to work; (3) performed work for many years "despite a long history of many of the issues she now alleges as disabling"; and (4) made statements that were inconsistent with the medical and other evidence of record.[3]  Tr. 464-67.

Notably, the ALJ found that plaintiff's credibility was undermined by her part-time employment as a bookkeeper and failure to report earnings associated with that position.  Tr. 466.  As plaintiff denotes, however, she "did report her earnings, as shown

---

[3] Implicit in the ALJ's finding is the notion that, while plaintiff's may have become disabled after the date last insured due to Lyme disease, she was not prior thereto.  See, e.g., Tr. 468 ("[e]ven though later testing, in August and December 2008, was positive for Lyme disease and other tick related infection[s], this does not confirm that [plaintiff] had any such infections during the insured period that ended three years earlier").  Plaintiff's Lyme disease, however, was diagnosed within the relevant adjudication period based on her constellation of signs and symptoms, which is a medically accepted diagnostic technique.  Compare Tr. 468 ("it is unclear what the basis for treatment for Lyme disease was because testing had been negative"), with Center for Disease Control and Prevention, "Lyme Disease Diagnosing and Testing," available at http://www.cdc.gov/lyme/diagnosistesting/index.html ("Lyme disease is diagnosed based on: Signs and symptoms [and a] history of possible exposure to infected blacklegged ticks").  It was therefore not reasonable to conclude, as the ALJ did, that plaintiff's allegedly disabling symptoms during the relevant time period were not attributable to Lyme disease and/or other tick related infections, which were ultimately confirmed by blood tests obtained in 2008, especially given that the record does not contain any reference to a tick bite subsequent to 2003 or to the abatement Lyme disease-related symptoms.

by the tax records submitted at Tr. 422-28." Pl.'s Opening Br. 16. Indeed, throughout her testimony, plaintiff has been transparent about the fact that she was employed in this capacity. See, e.g., Tr. 138, 141, 144, 148, 151.   Further, plaintiff performed this work less than ten hours per week, for a friend, on her own schedule, and only when she felt up to it.   Tr. 38-39, 42-44. Regardless, plaintiff was unable to continue in this position due to her alleged impairments. See Tr. 43-44, 65-66. Accordingly, because she earned less than the requisite earning levels and, further, may have been engaged in a sheltered workshop, it is undisputed that this work did not satisfy the ALJ's step-one inquiry or qualify as past relevant work.   Tr. 462, 471; see also Pl.'s Opening Br. 16.   The fact that plaintiff attempted to work part-time, but was ultimately unsuccessful, does not contradict her subjective symptom testimony. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("claimants should not be penalized for attempting to lead normal lives in the face of their limitations"). Therefore, the ALJ impermissibly relied on plaintiff's bookkeeper position as a basis to reject her statements.

The ALJ also found that plaintiff's activities of daily living belied her subjective symptom testimony. Tr. 466. After observing that, "[i]n cases like these where there is a remote date last insured, it is more difficult to determine the nature of the claimant's limitations attributable to severe impairments during the period at issue," such that plaintiff's "contemporaneous self-

report to treating sources memorialized in the treatment notes[4] is the most accurate portrayal of functioning," the ALJ concluded that plaintiff was "easily able to manage a home, garden and job as well as being social" during the relevant adjudication period. Id. An ALJ may discredit a claimant's testimony when he or she reports activities of daily living that "indicat[e] capacities that are transferable to a work setting" or "contradict claims of a totally debilitating impairment." Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012) (citations omitted).

Initially, the Court notes that the ALJ did not cite to any evidence in support of his conclusion. See Tr. 466. An independent review of the record reveals the contrary; in fact, there is not a single piece of evidence in the 707 page record that could reasonably be interpreted as corroborating the ALJ's determination that plaintiff was "easily able to manage a home, garden and job as well as being social" during the adjudication period at issue. As such, in evaluating plaintiff's credibility, the ALJ impermissibly mis-characterized the record. See Reddick, 157 F.3d at 722-23 (ALJ's "paraphrasing of record material" was "not entirely accurate regarding the content and tone of the record" and did not support an adverse credibility finding).

---

[4] The majority of evidence before the Court is from outside of the pertinent timeframe; the only medical reports relating to the adjudication period at issue are from naturopath Stacy Rafferty, Elaine Edmonds, M.D., and Dr. Springer. See Tr. 221-26, 249-59, 397-400.

For instance, the record demonstrates that plaintiff was unable to maintain her garden.[5]  See, e.g., Tr. 154 (March 2006 adult function report, in which plaintiff states that "I really miss my yardwork and gardening [but] am no longer [able] to do [either]"); see also Tr. 139.  As discussed above, plaintiff was could not persist in her part-time work as a bookkeeper, even on a flexible schedule.  Moreover, contrary to the ALJ's assertion, plaintiff has been consistent in her testimony that, although she does perform minor household chores, such as laundry and cooking, these tasks are difficult for her and punctuated by frequent rests; plaintiff's contemporaneous self-reports from the relevant time period lend further support to her statements made after the date last insured.  See Tr. 54-59, 138-40, 149-64, 489-91; see also Tr. 221-26, 249-59, 397-400.  Plaintiff has also been consistent in her testimony regarding the fact that the severity of her symptoms vary from day-to-day.  See, e.g., Tr. 54-59, 149, 151, 489-91. Accordingly, activities such as plaintiff's – i.e. occasionally

---

[5] The only reference to plaintiff's continued gardening is from her physical therapist's May 2006 chart notes.  Tr. 365 ("[p]atient's functional levels vary depending on her symptoms . . . She has done some gardening").  This sole reference neither constitutes substantial evidence, especially in light of the other evidence of record, nor evinces that plaintiff was "easily able to manage a . . . garden" during the relevant time period. Tr. 466.  Rather, this evidence supports plaintiff's testimony that her functional abilities vary daily, but, on good days, she attempts to live a normal life.  Tr. 365; see also Tr. 351-52 (subsequent chart note indicating that, at the time she ceased physical therapy, plaintiff's "strength has improved, especially with the lower extremities," although she could still only sit "for up to 25 minutes" and walk "for up to 20 minutes (but will have possible repercussions with shoulder and neck pain post ambulation)").

socializing, attempting to work part-time, and taking a full day, with frequent breaks, to engage in relatively limited chores — neither "indicat[e] capacities that are transferable to a work setting" nor "contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1113; see also Sprague v. Colvin, 2013 WL 2318844, *11-13 (D.Or. May 28, 2013) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

Likewise, the ALJ's determination that plaintiff lacked credibility because she worked for many years "despite a long history of many of the issues she now alleges as disabling" misconstrues the record and is unsupported by substantial evidence. Tr. 466. In making this finding, the ALJ relied on naturopath Stacey Rafferty's treatment notes from August 2005, which reflect that plaintiff experienced "dizz[iness] [with] no balance" and "low back pain" since "age 20." Tr. 221; see also Tr. 466. While the ALJ is correct that plaintiff worked with these impairments for several years, the ALJ's finding ignores that fact that, during the same examination, plaintiff endorsed a plethora of new symptoms associated with Lyme disease.[6] See Tr. 221-26; see also Tr. 249-59, 397-400. In evaluating plaintiff's claim from 2003 forward and

---

[6] As the ALJ expressly acknowledged, plaintiff's claim is premised primarily on symptoms associated with Lyme disease. Tr. 466 ("Lyme disease can cause [long-term] symptoms such as loss of muscle tone on one or both sides of the face, severe headaches and neck stiffness due to meningitis, shooting pains, heart palpitations and dizziness[,] pain that moves from joint to joint[,] numbness and tingling in the hands or feet and problems with concentration or short term memory . . . [plaintiff] alleges many of these symptoms") (citing Centers for Disease Control and Prevention, "Signs and Symptoms of Lyme Disease," available at http://www.cdc.gov/lyme/signs_symptoms/index.html).

Page 14 - OPINION AND ORDER

recognizing her Lyme disease as a severe impairment at step two, the ALJ implicitly acknowledged that plaintiff's circumstances had sufficiently changed to overcome the presumption of continuing non-disability.    See SSR 97-4, available at 1997 WL 740404 (interpreting Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1988)); see also Tr. 21-28 (2003 ALJ decision denying plaintiff's application for DIB, which was premised on "degenerative disc disease and peripheral neuropathy"); Pl.'s Reply Br. 5-6 ("[t]he fact that Plaintiff worked before, even while she experienced some symptoms, . . . does not undermine [her credibility] . . . If Plaintiff had not 'worked steadily for many years' until her symptoms worsened to the point they became disabling, then she could have been brought to task for having a 'poor work history'"). The fact that plaintiff was able to work with a lesser iteration of some of her alleged impairments, prior to contracting Lyme disease, is not a valid basis to discredit her testimony.

Finally, the ALJ identified alleged inconsistencies between plaintiff's hearing statements and the medical and other evidence of record. Tr. 464-67. Specifically, the ALJ found that plaintiff was not credible because: (1) her alleged "difficulty with spelling and writing coherent sentences" was contravened by her "function report, [wherein] her spelling was generally accurate, understandable and consistent with a high school education"; (2) an examination from 2004 revealed "normal . . . motor strength, muscle tone and bulk and coordination[,] directly contradict[ing] [plaintiff's] testimony about loss of muscle mass"; and (3) "Dr.

Springer stated [that plaintiff] was 'healthy-appearing,' [which] seems to be inconsistent with alleged fatigue, pain and other symptoms reportedly reduc[ing] her functionality to no regular activities." Tr. 465-66.

Here, the ALJ's finding ignores the record, wherein there is evidence evincing that plaintiff's husband was required to assist her in completing certain disability forms due to her "spelling word problems." See, e.g., Tr. 182, 204-05, 299. Similarly, the record reflects that, in some instances, it took plaintiff several days to complete the written components of her claim. See, e.g., 140, 204-05, 299. Accordingly, while there is no direct evidence specifically concerning her adult function report, considering the record as a whole, it was not rationale for the ALJ to conclude that plaintiff lacked credibility for this reason. See, e.g., Pl.'s Reply Br. 5 ("we do not know from the record how long it took Plaintiff to write her [adult function report] . . . We do not know if someone helper her edit . . . We do not know if the adequately spelled draft in the file is the first of fiftieth draft").

Regarding the other alleged contradictions articulated by the ALJ, the fact that plaintiff had normal muscle tone upon examination or was described as "healthy-appearing" has no bearing on whether she suffers from pain, fatigue, or weakness; these are rote observations recorded in plaintiff's medical record based on cursory examinations and, as such, in no way undermine her diagnosis of Lyme disease or the fact that she has consistently endorsed symptoms associated therewith. In other words, the

evidence that the ALJ identifies is not inherently inconsistent with plaintiff's subjective symptom statements and therefore does not adversely affect her credibility.

The foregoing discussion reveals that the ALJ failed to provide a clear and convincing reason, supported by substantial evidence, to reject plaintiff's statements concerning the extent of her limitations. The ALJ therefore erred in finding plaintiff not credible.

II.  Lay Testimony

Plaintiff next contends that the ALJ neglected to provide a legally sufficient reason to reject the statements of her husband, Mr. Hathaway. Lay testimony regarding a claimant's symptoms or how an impairment affects the ability to work is competent evidence that an ALJ must take into account. Molina, 674 F.3d at 1114 (citation omitted). The ALJ must provide "reasons germane to each witness" in order to reject such testimony. Id. (citation and internal quotation omitted). In rejecting lay testimony, the ALJ need not "discuss every witness's testimony on a individualized, witness-by-witness basis . . . if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." Id. (citations omitted).

Here, plaintiff's husband offered written testimony relating to her impairments in April 2006. Tr. 169-76. Additionally, in June 2010, Mr. Hathaway completed a questionnaire prepared by

Page 17 - OPINION AND ORDER

plaintiff's attorney in lieu of attending the 2010 administrative hearing, as he was working out-of-town on that date.  Tr. 653-54. In both instances, Mr. Hathaway described plaintiff as being unable to engage in sustained activity due to pain and fatigue, such that she could only engage in limited household chores.  Tr. 169-76, 653.  He also indicated that plaintiff's symptoms began, at a disabling level, prior to the date last insured.  Tr. 653; see also Tr. 171, 176.  Further, Mr. Hathaway stated that plaintiff has good days and bad days, and, on bad days, which occur on average two to three days per week, she can only do what is "absolutely necessary" to take care of herself.  Tr. 169, 171, 176, 653.

The ALJ discredited Mr. Hathaway's statements because they "tend . . . to support the other evidence showing that during the period at issue [plaintiff] was more functional than alleged."  Tr. 465; see also Tr. 466 ("[plaintiff] and her husband portray [her] as someone who is easily able to manage a home, garden and job as well as being social").  The ALJ also found that Mr. Hathaway's statements were "less reliable" because "these reports were completed months and years after the period in question," and "the questions posed by [plaintiff's] attorney are leading and aside from the last question do not attempt to focus Mr. Hathaway on the insured period."  Tr. 465.

As discussed above, the ALJ erroneously discredited plaintiff's subjective symptom testimony.  Therefore, it follows that the ALJ erred in discrediting Mr. Hathaway's testimony for one

Page 18 - OPINION AND ORDER

of the same reasons – i.e. plaintiff's activities of daily living. Further, despite the ALJ's assertion to the contrary, Mr. Hathaway's testimony from 2006 was, in fact, proffered a mere six months after the date last insured and expressly refers back to the relevant adjudication period. See Tr. 171 ("she cooks but over the last year especially she has to use more pre-made food and frozen quick meals"); see also Tr. 176 ("in the past 4-5 years that I have known Robbie she has gone fro[m] a ver[y] intell[i]gent [person] to someone who struggles with numbers and words[,] who is always correcting mistakes. What used to take her a couple of hours may take her all day [due to] pain and fatig[u]e"). Even assuming the ALJ appropriately disregarded Mr. Hathaway's 2010 testimony because it was rendered after the date last insured, he nonetheless improperly rejected Mr. Hathaway's 2006 statements, which essentially reflected the same limitations. See Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010) (affirming the ALJ's rejection of lay testimony where it was obtained years after the date last insured and did not relate back to the relevant time period). Thus, the ALJ erred in assessing the lay testimony.

III. Medical Opinion Evidence

Plaintiff also argues that the ALJ failed to provide clear and convincing reasons for rejecting the medical opinions of Drs. Counts, Stricker, and Springer. There are three types of medical opinions in social security cases: those from treating, examining, and non-examining doctors. Lester v. Chater, 81 F.3d 821, 830 (9th

Cir. 1995). In considering medical evidence, "a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir.2001). More weight is afforded to "opinions that are explained than to those that are not, . . . and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists." Id. (citations omitted). To reject the uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and convincing reasons. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected by specific and legitimate reasons. Id.

   A.   Dr. Counts

   In June 2001, plaintiff obtained treatment from Dr. Counts primarily for "tremendous anxiety and some panic symptoms," as well as "neurological problems not all of which can be explained by her cervical disk disease." Tr. 431. In September 2001, pursuant to her previous DIB application, Dr. Counts completed an opinion letter in which he reported that "[c]urrently, at this time, because of her mental status, severe anxiety, etc. patient would be totally disabled and unable to work." Tr. 705; see also Tr. 25. The doctor acknowledges, however, that while plaintiff "has a suspected multiple sclerosis[,] suspected fibromyalgia or other

unspecified rheumatic disease along with severe anxiety and panic disorder[,] [t]he prognosis for her is unclear as she's still undergoing diagnostic testing by various specialists." Tr. 705.

The ALJ afforded "little weight" to Dr. Counts opinion "due to the remote date, conclusory statement concerning disability, lack of objective diagnoses and lack of supportive treatment notes," especially in light of the fact that "[s]ubsequent records indicate neurological and rheumatologic workup was negative for the suspected impairments and the anxiety issues were not persistent." Tr. 469.

"Medical opinions that predate the alleged onset of disability are of limited relevance." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008). This is "especially true" where, as here, "disability is allegedly caused by a discrete event." Id. The remote date on which Dr. Counts' opinion was rendered is therefore dispositive because, during that period, plaintiff was not disabled as a matter of law and, further, she did not contract Lyme disease until at least two years thereafter. See Tr. 21-28. Moreover, Dr. Counts based his assesement largely on mental impairments that are neither alleged as the basis of plaintiff's current claim nor determined to be severe at step two, and plaintiff does not now challenge the ALJ's decision in this regard. See generally Pl.'s Opening Br.; Pl.'s Reply Br. As such, the ALJ's evaluation of Dr. Counts' opinion is affirmed.

B.    Dr. Stricker

In August and September 2008, plaintiff sought treatment with
Dr. Stricker, a Lyme disease specialist.    Tr. 432; see also
Fallstead v. Astrue, 2013 WL 5426223, *1 (N.D.Cal. Sept. 27, 2013)
("Rafael B. Stricker, M.D., [is] a Lyme disease expert").    In
September 2008, Dr. Stricker issued a letter on behalf of
plaintiff's current DIB application, in which he opined that she
"suffers from the disabling musculoskeletal and neurologic symptoms
of chronic Lyme disease, [including] joint pain, back pain, muscle
cramps, poor short term memory, vertigo, numbness, headaches,
fatigue, blurred vision, tinnitus, and difficulty concentrating[,]
[which render her without] the strength, coordination, or energy to
work."    Tr. 432.

The ALJ discredited Dr. Stricker's opinion because he "began
treating [plaintiff] nearly three years after the date last insured
[such that plaintiff's] subjective complaints or her symptomology
as reported to Dr. Stricker are not an appropriate basis on which
to assess her functionality between 2003 and 2005."    Tr. 469.

Here, the record supports the ALJ's conclusion.    Plaintiff did
not even begin treatment with Dr. Stricker until approximately
three years after the date last insured.    Tr. 432.    Additionally,
Dr. Stricker's opinion was not retrospective – i.e. it did not
relate plaintiff's current symptoms back to the relevant time
period.    Id.    Despite plaintiff's assertion to the contrary, it is
well-established that an ALJ may reject a medical opinion, even

Page 22 – OPINION AND ORDER

that of a treating doctor, where "it was completed . . . years after claimant's date last insured and was not offered as retrospective analysis." Senter v. Astrue, 2011 WL 3420426, *3 (C.D.Cal. Aug. 4, 2011) (citing Capobres v. Astrue, 2011 WL 1114256, *5 (D.Idaho Mar. 25, 2011)); see also Boucher v. Colvin, 2013 WL 3778891, *2-3 (W.D.Wash. July 18, 2013) ("while post-[date last insured] evidence cannot be rejected solely as remote in time, it can be rejected on the grounds that the evidence itself is not retrospective") (citing Smith v. Bowen, 849 F.2d 1222, 1225-26 (9th Cir. 1988); and Capobres, 2011 WL 1114256 at *5). Accordingly, the ALJ's assessment of Dr. Stricker's opinion is affirmed.

C.   Dr. Springer

In May 2005, plaintiff initiated care with Dr. Springer. Tr. 257-58, 392. At that time, Dr. Springer noted plaintiff's "2003 . . . tick bite that still swells and gets itchy periodically." Tr. 257. Shortly thereafter, Dr. Springer excised the tick bite and diagnosed plaintiff with Lyme disease; plaintiff continued to seek treatment from Dr. Springer every two to six weeks for several years. See Tr. 249-58, 392-93. In March 2008, Dr. Springer authored a letter at plaintiff's counsel's request, in which he stated

> I do believe that [plaintiff] is unable to work because of the multiple medical problems going on with her, which appear to be directly related to Lyme disease and mercury poisoning. I believe that she is disabled from work, since I have been seeing her . . . As far as the functional limitations of Lyme disease, I am by far not a specialist . . . However, there are multiple things that go on with Lyme disease which can include

Page 23 - OPINION AND ORDER

neurological problems, memory, vision, etc., multiple
muscle aches and pains persisting, severe fatigue,
malaise . . . During the day she is able to do very small
tasks, and is only able to sit for a short period of time
. . . As far as orthopedic problems, bending, lifting,
sitting, are all very limited because of the multiple
aches and pains.  She has had a lot of neurological
problems[,] [including] memory problems . . . I feel she
is definitely disabled, and would not be able to hold
down any form of employment.

Tr. 392-93; <u>see also</u> Tr. 394 (follow-up opinion letter from Dr.
Springer, also prepared in March 2008, reiterating that plaintiff
was unable to work "between August 2003 and September 30[,] 2005").

The ALJ found Dr. Springer's opinion "unpersuasive" for
several reasons: (1) it "appear[ed] to be based on the subjective
statements of [plaintiff]"; (2) it was not based on objective
findings because "Lyme disease . . . testing had been negative";
(3) he is not a Lyme disease specialist; and (4) plaintiff
"established [care] with Dr. Springer in May of 2005 - only a few
months before the date last insured - and the majority of his
records are for appointments after the date last insured."  Tr.
468.

As discussed above, however, the ALJ's finding that plaintiff
was not credible was neither based on the proper legal standards
nor supported by substantial evidence.  Further, Dr. Springer's
determination that plaintiff suffered from Lyme disease during the
adjudication period was eventually corroborated by positive blood
tests and the opinion of a specialist, Dr. Stricker, such that it
was improper for the ALJ to find his opinion less persuasive on
these grounds.  In other words, Dr. Springer's opinion ultimately

Page 24 - OPINION AND ORDER

had an objective basis.  In any event, as indicated previously, a positive blood test is not required to diagnose Lyme disease; the existence of signs and symptoms are adequate.

In addition, the fact that plaintiff established care several months before the date last insured is irrelevant.  Essentially, the ALJ's position is that Dr. Springer did not have access to sufficient information prior to the date last insured to conclude that plaintiff was disabled during the relevant time period.  The record demonstrates, however, that plaintiff sought treatment in 2004 for the same symptoms; given the timing of her tick bite, the only reasonable inference is that the symptoms manifesting in 2004 were attributable to Lyme disease.  See Tr. 397-400; see also Tr. 205.  Because Dr. Springer expressly reviewed this evidence in making his determination and, in fact, diagnosed and began treating plaintiff for Lyme disease prior to the date last insured, the ALJ's finding is unsupported by the record.  Tr. 249-58, 392-93. The ALJ therefore erred is evaluating Dr. Springer's opinion.

IV.   RFC Assessment and Step Four Finding

Lastly, plaintiff argues that the ALJ's RFC failed to adequately account for all of the limitations identified in her testimony, the lay testimony, and the medical opinions of Drs. Counts, Stricker, and Springer, thereby rendering his step four finding invalid.  The RFC is the most that a claimant can do despite her limitations.  See 20 C.F.R § 404.1545.  In determining the RFC, the ALJ must consider limitations imposed by all of a

Page 25 - OPINION AND ORDER

claimant's impairments, even those that are not severe, and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. SSR 96-8p, <u>available at</u> 1996 WL 374184. Limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

As discussed above, the ALJ properly rejected the opinions of Drs. Counts and Stricker, and therefore did nor err is failing to include limitations based on their assessments in the RFC. <u>See Stubbs-Danielson v. Astrue</u>, 539 F.3d 1169, 1175-76 (9th Cir. 2008). The ALJ, however, did not provide legally sufficient reasons for discrediting plaintiff's testimony, Mr. Hathaway's statements, and Dr. Springer's medical evaluation. Because the RFC does not account for these potential additional limitations, the RFC assessment is erroneous; it follows that the hypothetical posed to the VE was also erroneous. Moreover, these errors were not harmless because they were material to the ALJ's ultimate disability determination. <u>See Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006). Accordingly, the ALJ's RFC and step four finding are reversed.

V.   <u>Remand</u>

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir.), <u>cert.</u>

Page 26 - OPINION AND ORDER

denied, 531 U.S. 1038 (2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.   Strauss v. Comm'r of the Soc. Sec. Admin., 635 F.3d 1135, 1138–39 (9th Cir. 2011) (citation omitted). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled. Id. at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.   Id.   The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision.  Connett v. Barnhart, 340 F.3d 871 876 (9th Cir. 2003) (citation omitted)1; see also Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir. 2010).

Here, the ALJ committed harmful error by discrediting plaintiff's and Mr. Hathaway's testimony, as well as the opinion of

Page 27 - OPINION AND ORDER

Dr. Springer. It is clear from this evidence that plaintiff's Lyme disease renders her disabled. Additionally, the VE's testimony indicated that, if Dr. Springer's opinion was credited, plaintiff would be unable to perform her past relevant work or any other work as it exists in the national or local economy. Tr. 549. Further, pursuant to the Appeals Council's remand order, the ALJ contacted plaintiff's treating sources for clarification regarding her functional limitations as they existed during the relevant time period, yet no meaningful responses were available. <u>See</u> Tr. 574, 668-69, 694-703. Thus, even assuming there were evidentiary deficiencies, further proceedings would likely add nothing to the record, especially in light of the fact that plaintiff's claim has been pending for over seven years and has previously been remanded. Therefore, the Court credits evidence from plaintiff, Mr. Hathaway, and Dr. Springer as true and remands this case for the immediate payment of benefits.

## CONCLUSION

The Commissioner's decision REVERSED and REMANDED for the immediate payment of benefits. This case is DISMISSED.

IT IS SO ORDERED.

Dated this _13th_ day of November 2013.

_____
Ann Aiken
United States District Judge

Page 28 - OPINION AND ORDER